UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | | |
|---|---|---|
| DONNA M. BRUMMET, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-0581-DFH-VSS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |


ENTRY ON JUDICIAL REVIEW


Plaintiff Donna M. Brummet seeks judicial review of a final decision by the
Commissioner of Social Security denying her application for disability insurance
benefits.   Acting for the Commissioner, an Administrative Law Judge ("ALJ")
determined that Ms. Brummet was not disabled under the Social Security Act
because she retained the residual functional capacity to perform her past work as
a general office clerk, as well as a significant number of other physically light jobs.
Because the ALJ inadequately explained his decision to discount a treating
physician's opinion and inadequately addressed two of Ms. Brummet's alleged
limitations, the case must be remanded for further consideration.

*Background*

I.    *Benefits Claim History*

Ms. Brummet was 52 years old in 2002 when the ALJ found her ineligible for disability insurance benefits under the Social Security Act.  R. 18, 120.  Ms. Brummet had her high school diploma and had taken some classes at a vocational school.  R. 340-41.  She had worked as a general office clerk, bookkeeper, relief receptionist, medical secretary, medical records clerk, and technician/coder.  R. 40-42, 341-47, 386-87.

Ms. Brummet filed her application for disability insurance benefits on May 16, 2000, alleging that she had been disabled since May 25, 1998.  R. 120-22.  She claimed to suffer from diabetes, osteoarthritis, fibromyalgia, asthma, allergies, and multiple chemical sensitivities.  R. 137.

On August 2, 2000, the Social Security Administration denied Ms. Brummet's application for disability insurance benefits, finding that her condition should not prevent her from working.  R. 106.  Shortly thereafter, she filed a request for reconsideration.  In her request, Ms. Brummet stated that she suffered from increased pain and decreased mobility since filing for benefits.  R. 156.  She also reported a decreased ability to care for her daily needs.  Her request for reconsideration was denied on January 31, 2001.  R. 112.

In March 2001, Ms. Brummet filed a request for a hearing before an ALJ. See R. 114.  Ms. Brummet, her husband, and a vocational expert testified before ALJ Peter Americanos on February 26, 2002.  See R. 332-92.  Ms. Brummet was represented by an attorney.  Ms. Brummet identified her asthma and breathing problems as her worst impairments.  R. 351.  She also testified about her nineteen-year history of diabetes, for which she took insulin.  R. 348-49.

Ms. Brummet testified that her arthritis affected particularly her knees, hips, and lower back.  R. 351-55.  She stated that her arthritis pain was constantly present and that she had received treatment injections in her lower back several years ago.  R. 355, 358.  At the time of the hearing, she took Ultram for pain but claimed that she was allergic to it.  R. 355-56.  Ms. Brummet also complained of migraine headaches, for which she took Imitrex.  R. 375-76.  She described her fibromyalgia pain as "more or less all over the body" and testified that she sometimes experienced muscle twitches.  R. 377.

Ms. Brummet testified that she sat in a recliner and elevated her feet for about 15 to 30 minutes every two hours.  R. 359-60, 373-75.  She stated that she did this pursuant to Dr. Bakdash's advice and to prevent swelling in her feet.  R. 374-75.  Ms. Brummet estimated that she could stand for five minutes, walk one-quarter of a block at a time, and lift about one pound.  R. 363.  She stated that she had problems using her hands to write and difficulties reaching overhead due to pain in her shoulders and upper arms.  R. 361, 377-78.

Ms. Brummet testified that her neighbor's granddaughter did her housecleaning and laundry on weekends. R. 338. She testified that she dressed herself slowly in the mornings and prepared her own lunch. R. 368-69. She also testified that she read, watched movies, occasionally dined out at restaurants, and attended church. R. 364-66. Ms. Brummet participated in arthritis water exercise classes two to five times per week from May 1999 until October 1999, when she stopped attending because of asthma and allergy problems. R. 162. She also attended "People with Arthritis Can Exercise" (PACE) classes in 1999 and a few diabetes classes in 2000. She attended monthly support groups for fibromyalgia, diabetes, and asthma. R. 162-63.

In response to a hypothetical question incorporating the limitations ultimately adopted by the ALJ, the vocational expert testified that Ms. Brummet was capable of performing her previous work as an evening secretary at a vocational school or as a clinical secretary at the Visiting Nurse Association because those positions were similar to that of a general office clerk. R. 388-89. The vocational expert also testified that Ms. Brummet could perform light work generally as a general office clerk, mail clerk, or messenger order taker. R. 389-90. The vocational expert testified that Ms. Brummet could not perform sedentary work if she had lost fine dexterity in her hands. R. 390.

The ALJ issued his decision denying benefits on March 28, 2002. See R. 18-27. The Appeals Council denied further review of the ALJ's decision on

February 25, 2005.  See R. 5-7.  Therefore, the ALJ's decision is treated as the final decision of the Commissioner.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Ms. Brummet filed a timely petition for judicial review on April 21, 2005.  The court has jurisdiction in the matter under 42 U.S.C. § 405(g).

II.    *Medical History*

Ms. Brummet experienced a sudden onset of pulmonary problems in early 1998.  In January, she saw Doli Biondillo, M.D., a pulmonary specialist, for a chronic cough, mild shortness of breath, and occasional chest pain.  R. 201-02.  Ms. Brummet reported that she had been in good health until one month earlier when she allowed visiting relatives to smoke inside her home.  On examination, Ms. Brummet coughed frequently but her chest was relatively clear.  Spirometric testing was within normal limits and a chest x-ray was clear.  R. 201, 208.  Dr. Biondillo diagnosed her with cough-variant asthma, exacerbated by multiple triggers.  He prescribed a course of Prednisone, nasal spray, and an antihistamine.

In a follow-up examination, Dr. Biondillo noted that Ms. Brummet's cough had improved significantly but that she still was experiencing shortness of breath.  R. 198-99.  Her chest was clear and spirometric testing was still within normal limits.  Dr. Biondillo concluded that her cough-variant asthma had essentially resolved and that her shortness of breath was likely due to exertion and

bronchospasm caused by exposure to various chemicals in her home.  He advised that she continue her medication regimen and ventilate her home.

Dr. Biondillo referred Ms. Brummet to Frank Wu, M.D., an allergy and asthma specialist, for examination in March 1998.  R. 240, 242.  Dr. Wu noted that Ms. Brummet had sinus problems since age 27.   More recently, she complained of extreme sensitivity to the fragrances of cleaning chemicals, perfumes, and candles, especially in her workplace.  She reported that exposure to these substances had triggered two severe bouts of migraine headaches one month earlier.  On examination, Ms. Brummet coughed intermittently and had a very hoarse voice.  Dr. Wu wrote that she appeared to have allergic rhinitis and sensitivity to dust mites.  He advised that she avoid respiratory irritants and continue with her medications.

In a follow-up examination two weeks later, Dr. Biondillo reported that Ms. Brummet was doing much better, although she still reported increased symptoms when exposed to perfumes or other chemical odors.  R. 196.  He advised that she continue her current medication regimen.  Dr. Wu reported the same in a follow-up visit on May 15th.  R. 241.  Ms. Brummet testified that she missed six weeks of work in early 1998 for her pulmonary problems.   She stopped working altogether on May 25, 1998 when the office in which she worked was downsized. R. 340.

Ms. Brummet's primary care physician from early 1999 until early 2002 was Weil Bakdash, M.D.  At her first visit to Dr. Bakdash, Ms. Brummet complained of wrist pain and recent weight gain.  An x-ray of her right wrist showed "mildly osteoporotic" bones and degenerative changes involving the first carpal-metacarpal joint "characterized by joint space narrowing and bone sclerosis."  R. 303.  X-rays of her left hand and of her lumbar spine approximately one year later showed similar degenerative changes.  R. 302, 299.  Ms. Brummet was diagnosed with insulin-dependent diabetes at age 33.  She was taken to the emergency room in June 1998 for a severe hypoglycemic episode, but that appears to have been a one-time occurrence during the relevant time period.  R. 191-92.  Nevertheless, at her first visit to Dr. Bakdash, he described her diabetes as "uncontrolled."  R. 296.

In several later visits throughout 1999, Dr. Bakdash noted normal blood sugar results.  He reported that Ms. Brummet's diabetes was "under good control" by January 2000.  R. 278.  He treated her with inhalers and medication for asthma and prescribed Allegra for her allergic rhinitis.  He treated her arthralgia (joint pain) with Celebrex and she reported feeling much better in August 1999.  In November 1999, she reported that Vioxx had helped the joint pain in her knees.

In February 2000, Dr. Bakdash referred Ms. Brummet to Scott Swim, M.D., for her persistent hoarseness.  On examination, Ms. Brummet's sinuses were clear.  R. 233.  Dr. Swim diagnosed her with laryngitis.  R. 228.  By March, Dr.

Swim noted that Ms. Brummet's laryngitis was "slowly resolving" and by April she could use her voice more.  *Id.*

In May 2000, Ms. Brummet reported numbness in both arms and hands. Dr. Bakdash attributed these symptoms to changes in her cervical spine.  R. 274. A few weeks later, she experienced back pain radiating into both of her legs after moving a cabinet.  Dr. Bakdash gave her Ultram and an analgesic injection.  R. 272.  In early July 2000, Ms. Brummet reported that her asthma and allergies were doing better and that she believed Dr. Bakdash had found the "right combination" of medications for her pain.  Dr. Bakdash noted that her diabetes was under good control.  R. 267.  In Ms. Brummet's next two visits, however, she complained of spasm and numbness in her hands and that her left knee "wanted to go out" on her.  R. 263, 265.

Ms. Brummet underwent a consultative examination by Anton Kojouharov, M.D., on July 21, 2000.  R. 243-46.  Ms. Brummet complained of occasional wheezing and coughing, as well as pain in both knees, legs, and her lower back. Dr. Kojouharov found mild pain on palpation over the muscles of both shoulders, pain on palpation over the trapezoid muscles, and mild pain on palpation of the lumbar spine.  He recorded full range of joint motion, full muscle strength, and normal sensation with no muscle spasms throughout.  Her chest sounds were clear with no wheezing.  Dr. Kojouharov noted that Ms. Brummet's posture was normal, but that her gait was antalgic because of pain in her left hip.  Ms.

Brummet reported that she was able to walk short distances without an assistive device but that she used a cane for longer distances.  Dr. Kojouharov noted some crepitation (cracking or grinding) during movement in both knee joints.  He concluded that Ms. Brummet's diagnosis would benefit from x-rays because of her reported pain in both hips and both knees.

Dr. Bakdash referred Ms. Brummet to Nimu Surtani, M.D., an orthopedic specialist, in September 2000.  Dr. Surtani reviewed MRIs and x-rays of both of Ms. Brummet's knees.  He concluded that the MRIs confirmed bilateral medial compartment arthritis, patellofemoral arthritis, and complex medial meniscal tears.  R. 256, 298.  He noted that the x-rays showed "complete loss of the medial weightbearing space bilaterally, with early cystic changes." R. 258.  Ms. Brummet reported a lack of energy and discomfort throughout her back, arms, shoulders, and lower extremities.  Dr. Surtani observed multiple trigger points for pain in her upper and lower extremities, pitting edema of both lower extremities, passive hyperextension of both knees with pain bilaterally, and significant medial joint line tenderness bilaterally.  R. 256-57.  Dr. Surtani concluded that Ms. Brummet's knee symptoms were severe, but he suspected that they were not the cause of all her problems.  He also recommended that Dr. Bakdash address her edema and trigger point pain.  Dr. Surtani stated that if Ms. Brummet's knee symptoms persisted, she would be a candidate for debridement or knee replacement surgery.

In November 2000, Dr. Bakdash reported that Ms. Brummet's asthma had "improved a lot" and that she was "doing much better" with her arthritis. R. 73. In December, however, Ms. Brummet complained again of left knee pain and right arm pain and weakness. R. 70. In response to a request for information from the disability determination bureau, Dr. Bakdash stated that Ms. Brummet's cane was medically necessary to help her walk. He described her gait as antalgic but stable. R. 321.

Dr. Bakdash referred Ms. Brummet to Larry Greenbaum, M.D., who first saw her in November 2000 for problems related to osteoarthritis, fibromyalgia, and degenerative disc disease. R. 315-17. Ms. Brummet reported difficulties lifting her left leg and completing daily activities. Dr. Greenbaum observed fairly good range of motion in her hips and uncomfortable, full extension of her knees. He noted that Ms. Brummet's treatment was complicated by her allergies to multiple anti-inflammatory drugs, such as Celebrex, Vioxx, aspirin, ibuprofen, and Aleve. He increased Ms. Brummet's Ultram dosage since she appeared able to tolerate that medication.

Dr. Greenbaum found that Ms. Brummet had tenderness at all 18 of the potential fibromyalgia points. He noted the same at a follow-up visit in December 2000 and again in March 2001. R. 92, 94. In December, Dr. Greenbaum wrote that Ms. Brummet had "improved a little bit" because participation in PACE classes had reduced her pain and swelling. R. 93. By March, however, Dr.

Greenbaum assessed that Ms. Brummet "continue[d] to do fairly poorly."  R. 91.
Ms. Brummet reported problems with her knees wanting to give out and feeling
as if she were going to fall.  She asked if anything further could be done for her
knees.  She reported that she had numerous cortisone injections in the past but
none since 1998 and that, even then, her condition improved for only six weeks
at a time.  On examination, Dr. Greenbaum found prominent Heberden nodes in
both hands, painful movement of the knees, and strongly positive Tinel's sign in
both wrists which Ms. Brummet reported felt like "a thousand needles" going
through her hand.  He opined that she suffered from carpal tunnel syndrome.

In February 2001, Ms. Brummet complained to Dr. Bakdash that she was
having trouble grasping objects with her hands, and that her legs were getting
weaker and starting to give out on her.  R. 68.  Dr. Bakdash offered her a pain
injection for her left knee, but she declined.  In April, Dr. Bakdash wrote that Ms.
Brummet's asthma was under good control and that she was to see James Ehlich,
M.D., a rheumatologist, for her arthritis and pain.  R. 66.

Ms. Brummet reported to Dr. Ehlich that she had been hurting all over for
many years and that her medication had helped until about two weeks prior.  R.
89-90.  She reported frequent muscle spasms, significant pain in her feet, grinding
sensation in her knees, intermittent swelling in her knees and ankles, and
intermittent numbness and tingling throughout her body.  She told Dr. Ehlich
that she had moved into a home without stairs in July 2000 and that she had

been attempting to lose weight to reduce her symptoms and to make knee replacement surgery possible.   Dr. Ehlich's joint examination showed some osteoarthritis changes in her hands, tenderness in both heels, and soft tissue tenderness throughout most of her body.   His neurological examination was unremarkable.   Ms. Brummet's ankles were unremarkable and he observed no edema in her lower extremities.   Dr. Ehlich did note, however, swelling with crepitation and slight tenderness in Ms. Brummet's left knee.   Her right knee was tender with normal range of motion and no swelling, but crepitation.   Dr. Ehlich concluded that Ms. Brummet suffered from osteoarthritis, fibromyalgia, and general anxiety disorder.   He later completed a fibromyalgia residual functional capacity questionnaire about Ms. Brummet.   R. 74-79.

In June 2001, Ms. Brummet again complained to Dr. Bakdash that her knees and ankles wanted to give out on her.   R. 64.   However, she reported that her diabetes was under control and that her asthma was "much better" with her inhalers.   In August, Ms. Brummet complained of ulcers on her right leg and allergic rhinitis with hoarseness and cough.   R. 62.   Dr. Bakdash treated her ulcers with antibiotic cream and refilled her Claritin prescription.   She also saw Dr. Ehlich in August and complained of buckling knees, stiff and achy joints, and severe leg cramps.   Dr. Ehlich described her left knee as "tight" and rated her condition as improved.   R. 87.   In her October appointment, Ms. Brummet complained to Dr. Ehlich about her legs going out and a swollen left knee.   Dr.

Ehlich noted some swelling in the left knee and crepitation in the right knee.  R. 84.

In December 2001, Dr. Bakdash completed a pulmonary residual functional capacity questionnaire about Ms. Brummet.  R. 50-54.  One month later, Ms. Brummet visited Dr. Bakdash for a follow-up on her cellulitis.  R. 55-56.  Dr. Bakdash advised her to elevate her legs intermittently, to monitor her blood sugar, to comply with her diabetic diet, to follow good foot care, and to avoid trauma to her legs.

### The Statutory Framework for Determining Disability

To be eligible for disability insurance benefits, a claimant must establish that she suffers from a disability within the meaning of the Social Security Act. To prove disability under the Act, the claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.   42 U.S.C. § 423(d).   Ms. Brummet was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her. *Id.*

This standard is a stringent one. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stevens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability. The steps are:

(1) Has the claimant engaged in substantial gainful activity? If so, she was not disabled.

(2) If not, did the claimant have an impairment or combination of impairments that are severe? If not, she was not disabled.

(3) If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If so, the claimant was disabled.

(4) If not, could the claimant do her past relevant work? If so, she was not disabled.

(5) If not, could the claimant perform other work given her residual functional capacity, age, education, and experience? If so, then she was not disabled. If not, she was disabled.

See generally 20 C.F.R. § 404.1520. When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Applying the five-step process, the ALJ found that Ms. Brummet satisfied steps one and two:  she was not currently working and she suffered from the severe impairments of diabetes mellitus, asthma, osteoarthritis, and fibromyalgia. R. 19.  At step three, the ALJ found that Ms. Brummet failed to demonstrate that any of her severe impairments met or equaled a listed impairment.  R. 26.  At steps four and five, the ALJ limited Ms. Brummet to a workplace relatively free of noxious fumes, gases, smoke, and other respiratory irritants.  He also found that she must avoid extreme cold and heat, must be allowed to snack at various times during the day, must avoid overhead work, and had diminished fine dexterity in her hands but retained gross use.  *Id.*  The ALJ determined that Ms. Brummet retained the residual functional capacity to perform her past work as a general office clerk and a significant number of other light jobs in the national economy. R. 27.  He therefore concluded that Ms. Brummet was not disabled under the Social Security Act.  *Id.*

*Standard of Review*

"The standard of review in disability cases limits . . . the district court to determining whether the final decision of the [Commissioner] is both supported by substantial evidence and based on the proper legal criteria."  *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), quoting *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S.

389, 401 (1971).  To determine whether substantial evidence exists, the court must "'conduct a critical review of the evidence,' considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision . . . ."  *Briscoe*, 425 F.3d at 351, quoting *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); see also *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  The reviewing court must not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir. 1994).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  This determination by the court requires that the ALJ's decision adequately discuss the relevant issues:  "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."  *Briscoe*, 425 F.3d at 351, citing *Herron v. Shalala,*19 F.3d 329, 333-34 (7th Cir. 1994).  Although the ALJ need not provide a complete written evaluation of every piece of testimony and evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005),

a remand may be required if the ALJ has failed to "build a logical bridge from the evidence to her conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

*Discussion*

Ms. Brummet challenges the ALJ's decision on four grounds. She argues that the ALJ (1) failed to consider her migraine headaches; (2) failed to fully develop the record with respect to the need to elevate her legs; (3) improperly rejected the opinions of two treating physicians; and (4) erred in evaluating her credibility. The court finds that the ALJ failed to account for his decision to reject one treating physician's opinion and failed to address adequately Ms. Brummet's migraine headaches and her need to elevate her legs. Because each failure independently requires remand, the court does not reach Ms. Brummet's remaining argument about credibility.

I.     *Migraine Headaches*

The ALJ did not identify Ms. Brummet's migraine headaches as a severe impairment in step two of his analysis. Ms. Brummet argues that this was an error because her migraine headaches cannot be characterized as a "slight abnormality . . . that has no more than a minimal effect on the ability to do basic work activities." See SSR 96-3p (describing "not severe" impairments). She points out that both Dr. Ehlich and Dr. Greenbaum noted that she had migraine headaches. R. 74, 93, 316-17. She also notes that she takes prescription anti-

migraine medication (Imitrex).  R. 58, 376.  Finally, Ms. Brummet points to her own testimony at the hearing that she gets "one to two, maybe sometimes three" migraines per month, depending on her exposure to chemicals and other respiratory irritants.  R. 375-76.

A claimant's burden at step two is not an onerous one.  At later steps, the ALJ evaluates a claimant's ability to work based on the totality of her impairments, whether they are deemed severe or not.  As long as the ALJ proceeds beyond step two, as in this case, no error could result solely from his failure to recognize an impairment as "severe."

Nevertheless, an ALJ is required to consider all of a claimant's medically determinable impairments at steps four and five when determining residual functional capacity and the ability to meet the demands of work.  See 20 C.F.R. § 404.1520(e) ("If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record"); 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe' . . . when we assess your residual functional capacity").  An ALJ must consider the combined effect of all impairments, including non-severe impairments.  See *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003), citing 20 C.F.R. § 404.1523; SSR 96-8p (recognizing that non-severe impairments,

when considered together with limitations and restrictions due to other impairments, may be critical to the outcome of a claim).

In this case, Ms. Brummet testified that she suffered from migraine headaches one to three times per month, and that her migraine medication alone was insufficient to stop a migraine episode. She testified that she needed to lie down or to go into a quiet, dark room for her medication to work. See R. 376. The ALJ did not include these restrictions in his hypothetical question to the vocational expert. He also did not account for them in his determination of Ms. Brummet's residual functional capacity. And although the ALJ found generally that Ms. Brummet's testimony about her limitations was not entirely credible, he did not specifically address any testimony or evidence relating to her migraine headaches, other than to point to Dr. Greenbaum's note that she in fact suffered from them. See R. 22.

The ALJ is not required to discuss every piece of evidence in the record. He may not, however, ignore an entire line of evidence contrary to his opinion, because doing so prevents a reviewing court from knowing whether his decision is supported by substantial evidence. *Golembiewski*, 322 F.3d at 917. From the record available for judicial review, the court cannot be confident that the ALJ considered Ms. Brummet's testimony about the alleged limitations caused by her migraine condition. By failing to address this testimony and her migraine

headaches more generally, the ALJ improperly ignored an entire line of evidence relevant to his disability determination.

II.     *Leg Elevation*

Ms. Brummet also argues that the ALJ erred by failing to get more information from her treating physician, Dr. Bakdash, about the height at which she needed to elevate her legs.  Dr. Bakdash had advised Ms. Brummet to elevate her legs intermittently to prevent the recurrence of cellulitis caused by her diabetes mellitus.  See R. 56.[1]  At the hearing, Ms. Brummet testified that she elevated her feet for about 15 to 30 minutes at a time, approximately every two hours.  R. 359-60, 373-75.  The record from the hearing suggests that she did this while sitting in a recliner.  See R. 360.

The vocational expert testified at the hearing that Ms. Brummet would not be disabled if she were required to elevate her legs twelve inches or less from the floor.  R. 389.  During cross-examination, however, the vocational expert testified that Ms. Brummet could not perform full-time work if she were required to elevate her legs at waist level (as in a recliner).  R. 390-91.

---

[1]Cellulitis is an acute inflammation of the skin caused by infection. *Stedman's Medical Dictionary* 307 (26th ed. 1995).  Diabetes-related skin ulcers are a known risk factor for cellulitis.

Based on the vocational expert's testimony, the ALJ concluded that Ms. Brummet could perform full-time work even if she were required to elevate her feet intermittently up to twelve inches.  R. 25.  The ALJ declined to find that Ms. Brummet was required to elevate her legs at waist level because he found no support for that requirement in the record.  *Id.* at n.1.

Ms. Brummet argues that the ALJ erred by assuming that she needed to elevate her legs only up to twelve inches.  She contends that the ALJ should have taken "administrative notice" that elevating her legs in a recliner meant that she elevated them more than twelve inches.  She also argues that the ALJ should have contacted Dr. Bakdash to clarify his recommendation.

The ALJ has a duty to fully develop the record.  *Luna v. Shalala*, 22 F.3d 687, 692-93 (7th Cir. 1994).  The regulations provide that the ALJ will seek additional evidence or clarification from a medical source when the report from that source contains a conflict or ambiguity that must be resolved or when the report does not contain all of the necessary information.  See 20 C.F.R. § 404.1512(e)(1).  The ALJ's duty to recontact a medical source is triggered only when the evidence received is inadequate to determine whether or not a claimant is disabled.  *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004), citing 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination"); see also *Luna*, 22 F.3d at

693, citing 20 C.F.R. § 404.1527(c)(3) ("If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §[] 404.1512 . . . .").

Here, the evidence was inadequate for the ALJ to determine whether or not Ms. Brummet was required to elevate her legs higher than twelve inches and was therefore disabled.  Dr. Bakdash's treatment notes did not state the height at which he intended for Ms. Brummet to elevate her legs to prevent cellulitis.  Ms. Brummet herself testified that it was necessary for her to elevate her legs intermittently while sitting in a recliner to reduce symptoms of swelling.  This testimony put the ALJ on notice that Ms. Brummet may have needed to elevate her legs at a height above twelve inches.  And again, although the ALJ found generally that Ms. Brummet's testimony about her limitations was not entirely credible, he did not cite or discuss any evidence contradicting this claim.  Because the issue of leg elevation was decisive in the disability determination, the ALJ had a duty to recontact Dr. Bakdash or obtain other evidence to clarify his understanding of the issue.  See, *e.g.*, *Cline v. Barnhart*, 2002 WL 31242223, *8 (S.D. Ind. Aug. 16, 2002) (ALJ had duty to recontact treating physician where claimant testified that physician put restrictions on lifting, bending, pushing, and pulling, but physician did not mention limitations in any reports nor include an residual functional capacity finding); *Gossett v. Chater*, 947 F. Supp. 1272, 1280

(S.D. Ind. 1996) (ALJ had duty to recontact physician for clarification if he believed physician's questionnaire responses were inconsistent with statements made by him in an earlier report); cf. *Skarbek*, 390 F.3d at 504 (ALJ acted within discretion by not recontacting treating physician whose opinion was not supported by x-rays or his own progress notes and was contradicted by other treating physicians); *Luna*, 22 F.3d at 692-93 (ALJ did not err by failing to obtain updated medical records that claimant alleged would have supported his claims of pain and movement restrictions where ALJ had extensively questioned claimant about his pain, medication, and activities and had reviewed six years of conflicting medical records).

III.    *Treating Physicians' Opinions*

Ms. Brummet also challenges the ALJ's decision to discount the opinions of Dr. Bakdash and Dr. Ehlich.  A treating physician's opinion regarding the nature and severity of a claimant's medical condition is entitled to controlling weight if well-supported by medically acceptable techniques and not inconsistent with other substantial evidence in the record.   20 C.F.R. § 404.1527(d)(2); *Skarbek*, 390 F.3d at 503.  However, an ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting physician or if the treating source's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503, citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The court does not resolve Ms. Brummet's challenge to the ALJ's treatment of Dr. Bakdash's opinion.  The ALJ did point out, however, that agency physicians and even Dr. Ehlich had reviewed the entire record and concluded that Ms. Brummet was not as limited as Dr. Bakdash suggested.

On the other hand, the ALJ did not identify substantial evidence supporting his decision to discredit Dr. Ehlich's opinion.  In January 2002, Dr. Ehlich completed a "fibromyalgia residual functional capacity questionnaire" about Ms. Brummet.  See R. 74-79.  Dr. Ehlich wrote that Ms. Brummet suffered from "constant" and "daily" moderate to severe pain that he also described as "deep," "stiff," and "burning."  He assessed that her pain was "constantly" severe enough to interfere with her attention and concentration.  He noted that she met the American Rheumatological Association's criteria for fibromyalgia.  He also noted that Ms. Brummet's medications carried side effects of dizziness, drowsiness, and gastrointestinal upset.

Dr. Ehlich opined that Ms. Brummet could sit for only 30 minutes at one time and for a total of about four hours each workday.  He opined that she could stand for only 15 minutes a time and for a total of four hours each workday.  He concluded that Ms. Brummet could rarely lift up to ten pounds, could rarely stoop, and could never twist, crouch, or climb ladders or stairs.   He also stated that she had significant limitations in repetitive reaching, handling, or fingering. He estimated that she could grasp, turn, or twist objects with her hands only as

-24-

much as 15 to 20 percent of the day, and could perform fine finger manipulations only about 20 percent of the day.  Dr. Ehlich concluded that Ms. Brummet would need to take unscheduled breaks about once per month, lasting about two to four hours, and that she would need to lie down during these breaks.  He also stated that she would miss about three days of work per month.  The ALJ characterized Dr. Ehlich's evaluation as permitting Ms. Brummet to perform sedentary, but not light, work.  R. 24.[2]

The ALJ rejected Dr. Ehlich's assessment for several reasons.  See R. 23. First, he stated that the assessment was "not supported by objective medical findings."  Second, he wrote that the assessment was inconsistent with Dr. Ehlich's own treatment notes, which he claimed showed only mild abnormalities. Finally, he concluded that the assessment was "not consistent with or supported by the other credible evidence of record."

Ms. Brummet argues that the reasons provided by the ALJ in rejecting Dr. Ehlich's evaluation are insufficiently conclusory.  SSR 96-2p states that the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must

---

[2]Jobs within the "light work" category require frequent lifting or carrying of objects weighing up to 10 pounds.  They also require "a good deal" of walking and standing, or involve sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. § 404.1567(b).  A "good deal" of walking and standing equates to approximately 6 hours during an 8-hour workday, with intermittent sitting during the remaining time.  SSR 83-10.  Even "sedentary" jobs require sitting approximately 6 hours per workday.  *Id.*

be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  See also 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Ms. Brummet is correct that the ALJ inadequately explained two of his reasons for discrediting Dr. Ehlich's opinion.  The Seventh Circuit has repeatedly stated that an ALJ must minimally articulate reasons for crediting or rejecting a treating physician's opinion, and that the decision must build an accurate and logical bridge from the evidence to the conclusion.  *E.g.*, *Clifford*, 227 F.3d at 870 (remanding for ALJ to reevaluate treating physician's opinion where ALJ rejected opinion on grounds that it was unsupported by medical evidence and was inconsistent with the claimant's description of her daily activities, but did not explain the supposed inconsistencies).  Here, the ALJ's bare statements that Dr. Ehlich's opinion was "not supported by objective medical findings" and "not consistent with or supported by the other credible evidence of record" do not meet the minimal articulation standard.  Unlike his discussion of Dr. Bakdash's evaluation, the ALJ did not explain or cite specific evidence to support these two reasons for discrediting Dr. Ehlich's opinion.

Further, the record does not require the conclusion reached by the ALJ.  Certainly, there is evidence in the record that would support Dr. Ehlich's opinion.

-26-

For example, Ms. Brummet argues that it is difficult to see how someone with her knee problems could stand long enough to perform light work.  She points to the MRI results from September 2000 showing bilateral medial compartment arthritis, patellofemoral arthritis, and complex medial meniscal tears in both knees.  She also points to x-rays showing a complete loss of the medial weightbearing space bilaterally.  Ms. Brummet also cites Dr. Surtani's note that she might be a candidate for total knee replacement in both knees.  Dr. Ehlich himself recorded crepitation, swelling, and slight tenderness in Ms. Brummet's left knee, and tenderness with crepitation in her right knee.

An ALJ may discount a treating source's opinion as long as the ALJ provides a reasoned explanation for that decision.  *Skarbek*, 390 F.3d at 503, citing *Clifford*, 227 F.3d at 870.  In this case, the ALJ did not adequately explain his reasons for discrediting Dr. Ehlich's opinion.  As a result, this court cannot determine whether or not the ALJ's assessment of Dr. Ehlich's opinion is supported by substantial evidence.

## Conclusion

Even where the record contains sufficient evidence to support an ALJ's decision, the decision may not be upheld where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); accord, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).  The cumulative effect of the ALJ's

mistakes in this case warrant remand because the ALJ failed to build the necessary logical bridge between the evidence and his findings.  Accordingly, the ALJ's decision is reversed and remanded for reconsideration consistent with this entry.  On remand, all steps of the five-step sequential evaluation are subject to reconsideration.  Final judgment shall be entered consistent with this entry.

So ordered.

Date: June 13, 2006

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Thomas E. Hamer
tom@tomhamerlaw.com